UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
EASTERN DIVISION

| | |
|---|---|
| Joye Knutson, | Court File No.: _____ |
| Plaintiff, | |
| v. | **COMPLAINT**<br>**(JURY TRIAL DEMANDED)** |
| EPIC Management, LLC, | |
| Defendant. | |

Plaintiff Joye Knutson, by and through her attorneys, Nichols Kaster, PLLP, brings this action for damages and other relief, stating the following as her claims against Defendant EPIC Management, LLC:

## PARTIES

1. Plaintiff Joye Knutson is an adult individual residing in Fargo, North Dakota.

2. Defendant EPIC Management, LLC ("Defendant," "EPIC," or the "Company") is a limited liability company formed in North Dakota. EPIC's headquarters and principal place of business is located at 745 31st Ave East, Suite 105, West Fargo, North Dakota, 58078.

## JURISDICTION AND VENUE

3. Jurisdiction is proper pursuant to 28 U.S.C. § 1331. The Court has original jurisdiction to hear this Complaint and to adjudicate the claims stated herein because this

1

action asserts claims arising under federal law, specifically, the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* (the "FLSA").

4. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's state whistleblower claim.

5. Venue is proper in the District of North Dakota because Defendant conducts business in the State of North Dakota and a substantial part of the events and omissions giving rise to the claims described herein occurred in this District. *See* 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

**Knutson Commences Her Employment with EPIC.**

6. EPIC is a real estate investment, development, and management firm operating out of its headquarters in West Fargo, North Dakota.

7. On or about January 31, 2022, Knutson commenced her employment with EPIC as its Vice President of Human Resources.

8. Knutson reported directly to EPIC's Chief Executive Officer, Amy Hass.

9. Hass had enthusiastically recruited Knutson to join the Company as EPIC's first dedicated Human Resources ("HR") leader. Prior to Knutson's hire, EPIC's payroll coordinator had been responsible for many of the Company's HR functions.

10. At the time of her hire, Knutson had worked in human resources leadership for approximately twenty-five years and had experience working on employer compliance with the Federal Labor Standards Act (the "FLSA") and related state wage and hour laws.

11. Hass told Knutson that she wanted Knutson to be her "right hand" at EPIC.

12. Knutson was hired at a time of rapid growth at EPIC. During the first few months of Knutson's employment, the Company grew from approximately 50 employees to 80 employees.

13. At the outset of her employment, Hass told Knutson that she wanted Knutson to develop and implement employee and HR-related policies and procedures, lead recruitment efforts, enhance EPIC's employee benefits programs, and monitor and implement compliance with federal and state requirements.

14. Shortly after Knutson began working for EPIC, she notified Hass that she planned to begin working on developing employee job descriptions. Knutson explained that this would also help her better understand the job positions within the Company.

15. Knutson told Hass that she would first conduct an analysis of the different job positions at EPIC and work with the relevant managers and incumbents to create job descriptions. Knutson explained that this process would assist her in developing salary ranges, job postings and performance management expectations for each job position.

16. Hass approved Knutson's job position analysis project.

17. In or around early February, during an EPIC management meeting, Knutson announced that she would be undertaking a thorough analysis of all Company job positions.

18. Shortly thereafter, in or around early February, Knutson began her analysis. As a first step, Knutson sent job analysis worksheets to a number of EPIC managers and asked them to complete the detailed worksheets to the best of their abilities. Knutson also conducted meetings with some of the managers to assist them in completing the worksheets.

**Knutson Discovers Violations of the FLSA and Engages in Protected Activity.**

19. Early on in Knutson's review of EPIC's employee job positions and the completed job analysis worksheets, she discovered that a number of EPIC employees had been misclassified as "exempt" under the FLSA and paid on a salary basis when they should have instead been classified as "nonexempt" and paid an hourly rate pursuant to the FLSA.

20. Upon information and belief, the EPIC employees who were misclassified as "exempt" had occasionally worked over 40 hours during a workweek and did not receive overtime pay.

21. For example, several of the employees in EPIC's Marketing and Accounting Departments were classified as exempt at the time of their hire when they should have been classified as nonexempt, paid according to an hourly rate, and paid an overtime rate for any hours worked over 40 in a workweek. Based on Knutson's analysis of EPIC's job positions and her experience with FLSA wage and hour compliance as a human resource professional, these employees did not qualify for any of the standard FLSA exemptions. As a limited example, the Marketing and Accounting employees that Knutson believed in good faith had been misclassified did not manage any department, direct the work of other employees, have the ability to hire or fire other employees, exercise discretion or independent judgment with respect to matters of significance, and did not perform work requiring advanced knowledge or degree.

22. In or around February 2022, shortly after Knutson's discovery that EPIC had misclassified several job positions, Knutson informed Hass during one of their weekly,

one-on-one meetings, that, based on her analyses, certain EPIC employees had been misclassified as "exempt" under the FLSA.

23. Hass responded that she had "no idea" what Knutson was talking about and that she was not familiar with the terms "exempt" and "nonexempt" relating to the FLSA.

24. Knutson patiently explained the difference to Hass between "exempt" and "nonexempt" employees, as well as the potential consequences of FLSA misclassification.

25. In response, Hass confirmed that FLSA classification was a "new concept" and that EPIC had classified employees as "salaried" simply because it was "handy."

26. Knutson acknowledged to Hass that small, start-up companies who grow exponentially during a short period of time often face initial wage and hour compliance challenges but that the FLSA classifications for employees could be swiftly corrected.

27. Knutson told Hass that she would put together some information regarding employee classification under the FLSA and send it to Hass.

28. Following this meeting, approximately five days later, Knutson sent Hass a document containing information about employee FLSA classification from a federal Department of Labor Wage and Hour Fact Sheet, along with information sourced from a website written by an attorney that provided examples of FLSA "exempt" and "nonexempt" job positions with sample analyses.

29. Knutson's goal in sending Hass this information was to educate Hass, which would allow Knutson and Hass to talk through each of the EPIC job positions that had been misclassified.

30. After this initial meeting, beginning in approximately mid-March 2022, Knutson would bring up the employee FLSA misclassification issue in nearly every one-on-one meeting with Hass. Knutson also shared her understanding and belief that some of these misclassified employees, on occasion, had worked over 40 hours in a workweek and were not paid the overtime premium.

31. On numerous occasions, Knutson insisted to Hass that EPIC needed to develop a plan to ensure compliance with the FLSA and correct the continued misclassification of employees. Knutson explained to Hass that this was a very urgent concern because EPIC was now on notice of the misclassification and potential overtime violations and that this would be considered a willful violation of the FLSA. Knutson explained the consequences of an employer's willful violation of the FLSA to Hass, including that the Company could face monetary penalties.

32. Each time Knutson raised the employee FLSA misclassification issue with Hass during their weekly one-on-one meetings, Hass acknowledged the issue but did not take action to correct the FLSA classifications of the employees whose job positions were at issue.

33. On several occasions, during their weekly one-on-one meetings, Hass told Knutson that she had concerns about the willingness of Todd Berning, EPIC's Owner and President, to engage on the issue.

34. On at least one occasion, Hass told Knutson that Berning "[will] never go for this," referring to EPIC correcting employees' FLSA classification and compensation.

35. In or around early March 2022, Berning sent an email to Knutson, Hass and EPIC's payroll administrator requesting that an existing employee in the Aviation Department be re-classified as an exempt and salaried employee.

36. Knutson told Hass that she suspected the position in the Aviation Department was nonexempt and that EPIC should not re-classify the employee as exempt until Knutson completed her formal job analysis of the role. Hass replied to Knutson: "Well, we'll need to do it because [Berning] wants it done."

**Knutson Continues Engaging in Protected Activity and is Retaliated Against.**

37. Following Knutson's original notification to Hass in or around February 2022 that EPIC was misclassifying employees under the FLSA, Knutson's efforts to persuade EPIC to comply with the FLSA, and her opposition to misclassifying new hires, Berning became hostile towards Knutson during meetings and in email communication.

38. For example, on or about Wednesday, March 16, 2022, during a meeting between Berning, Hass and Knutson about revamping EPIC's employee performance appraisal schedule, Berning screamed at Knutson and also called her a "liar." Knutson was so disturbed by Berning's aggressive and bullying conduct that she resigned her position during the meeting. Knutson returned to work on or about Monday, March 21, 2022, after Hass asked Knutson to return to work and agreed to work with Berning to have him apologize and communicate differently with Knutson going forward.

39. During a meeting with Hass on or about March 21, 2022, Knutson again raised her concerns about re-classifying the employee in the Aviation Department as exempt and as salaried before she was able to complete the classification audit. Knutson

asked Hass why EPIC would knowingly move an employee to an exempt position when it was clear that the position did not meet the criteria of any exemption. Knutson demanded that the relevant job analysis be completed before classifying the employee as exempt for the purposes of the FLSA simply because Berning wanted the employee classified that way.

40. In a one-on-one meeting with Hass in or around April 2022, Knutson proposed communications strategies to notify employees of changes to their FLSA classification and any related compensation changes. During this meeting, Hass suggested that the Company's employment attorney come in to explain the changes in FLSA classification to EPIC employees. Hass also suggested bringing in the employment attorney to educate Berning on FLSA classification and the importance of classifying employees correctly under the FLSA.

41. Knutson eagerly agreed to both of Hass' suggestions, stated that she believed these were excellent ideas and offered to contact the employment attorney herself to get the meetings scheduled.

42. In response, Hass told Knutson to hold off on scheduling any employee communication meetings with the Company's employment attorney and that she would speak to Berning.

43. Throughout the Spring of 2022, Knutson continued to bring up the FLSA misclassification of EPIC employees during her meetings with Hass. Knutson demanded that the Company take steps to classify the employees correctly and ensure proper compensation under the FLSA consistent with her job position analyses.

44. On one occasion, in or around early May 2022, Hass asked to see the job analysis work sheets. Knutson agreed to provide them to Hass but warned that EPIC could not manipulate the job positions and responsibilities to "fit" them to the Company's compliance needs.

45. Knutson provided Hass the job analysis worksheets but remained concerned that Hass would try to alter the job positions to make them fit the FLSA requirements for "exempt" classification status.

46. In or around the end of June 2022, after repeated inaction by EPIC to correct the FLSA classification of certain employees, Knutson told Hass that she planned to document her findings regarding EPIC's misclassification of employees in violation of the FLSA, document how and when she discovered the FLSA violations, identify who she notified at EPIC and when, and list her efforts to persuade EPIC to cease its violations and become compliant with the FLSA. Knutson told Hass that she planned to have the document notarized, place a copy in her personnel file at EPIC, and retain her own copy in order to protect herself from individual liability as an HR professional.

47. In response, Hass appeared puzzled and annoyed that Knutson would take this step and asked if Knutson really believed it was necessary.

48. Knutson confirmed that it was necessary, explained that she originally brought her concerns to Hass about FLSA misclassification in February 2022 and that months had gone by without the Company engaging in corrective action. Knutson stated that she believed EPIC's continued misclassification of certain employees was now a willful violation of the FLSA and that she did everything she could possibly do within the

scope of her position to try to convince EPIC to make changes to correctly classify its employees.

49. In or around early July 2022 Knutson was out of the office on vacation and returned to the office on or about July 11, 2022.

50. On or about July 13, 2022, Berning and Hass asked to meet with Knutson. During the meeting, Knutson asked Berning if she had done something to upset him because he gave her the impression that he did not like her. Berning replied that he did not interact much with Knutson so her question was akin to someone asking him if he liked the Company's maintenance employee at its Bismarck location.

51. On July 19, 2022, Berning terminated Knutson's employment with EPIC.

52. That day, Berning walked into Knutson's office with Blake Nybakken, Chief Operating Officer, and summarily informed Knutson that it was "not working out" and that her termination was effective immediately.

53. Upon information and belief, after Knutson's termination EPIC has continued its practice of misclassifying employees under the FLSA.

## CAUSES OF ACTION

### COUNT I

**Retaliation
in Violation of the Fair Labor Standards Act
29 U.S.C. § 215(a)(3)**

54. Plaintiff incorporates the foregoing paragraphs by reference.

55. At all relevant times, Defendant was a covered "employer" of Plaintiff within the meaning of the FLSA. 29 U.S.C. § 203(d).

56. At all relevant times, Plaintiff was an "employee" of Defendant within the meaning of the FLSA. 29 U.S.C. § 203(e).

57. Section 215(a)(3) of the FLSA makes it unlawful for any person to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint . . . related to [the FLSA] . . . ."

58. Under the FLSA, an employee engages in protected activity when they orally complain to their employers about policies or practices that violate the FLSA. *Kasten v. Saint-Gobain Performance Plastics*, 563 U.S. 1 (2011).

59. Plaintiff engaged in protected activity within the meaning of the FLSA by making oral complaints to her employer regarding the misclassification of employees under the FLSA and failure to pay overtime compensation, opposing Defendant's misclassification of employees and failure to classify employees correctly under the FLSA, and by taking affirmative actions to gain Defendant's compliance with the FLSA and ensure employees were classified and compensated correctly as "exempt" and/or "nonexempt" employees.

60. Defendant retaliated against Plaintiff in violation of the FLSA by terminating her employment because of her protected activity.

61. Defendant's conduct as alleged herein violated Plaintiff's rights under the FLSA and was knowing, willful, and malicious.

62. Defendant's violations of the FLSA were willful under 29 U.S.C. § 255 and without a good faith or reasonable basis.

63. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer damages, including, but not limited to, a loss of income and benefits, emotional distress, harm to reputation, lost earning capacity, and other harm, in an amount in excess of $75,000.

64. Pursuant to 29 U.S.C. § 216(b), Plaintiff is entitled to all "such legal or equitable relief as may be appropriate to effectuate the purposes of § 215(a)(3)," including, but not limited to, liquidated damages, compensatory damages, and punitive damages, as well as attorneys' fees, costs, and disbursements incurred in connection with this claim. Plaintiff is entitled to full relief under the FLSA.

## COUNT II

### Retaliation
### in Violation of North Dakota Century Code § 34-01-20

65. Plaintiff incorporates the foregoing paragraphs by reference.

66. Section 34-01-20(1)(a) of the North Dakota Century Code makes it unlawful for an employer to "discharge, discipline, threaten discrimination, or penalize an employee regarding the employee's compensation, conditions, location, or privileges of employment because: a. [t]he employee . . . in good faith, reports a violation or suspected violation of federal, state, or local law, ordinance, regulation, or rule to an employer . . ."

67. At all relevant times, Defendant was an employer and Plaintiff an employee for the purposes of Section 34-01-20 of the North Dakota Century Code.

68. Plaintiff engaged in protected activity within the meaning of Section 34-01-20(1)(a) of the North Dakota Century Code because Plaintiff, in good faith, reported

violation(s) and/or suspected violation(s) of the FLSA to her employer, specifically, the misclassification of employees under the FLSA and failure to pay overtime compensation.

69. Defendant retaliated against Plaintiff in violation of Section 34-01-20(1)(a) of the North Dakota Century Code by terminating Plaintiff's employment because of her protected activity.

70. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer damages, including, but not limited to, loss of income and benefits, emotional distress, harm to reputation, lost earning capacity, and other harm, in an amount in excess of $75,000.

71. Pursuant to Section 34-01-20(3) of the North Dakota Century Code, Plaintiff is entitled to "actual damages," including, but not limited to, attorneys' fees, costs, and disbursements incurred in connection with this claim. Plaintiff is entitled to full relief under North Dakota law.

72. Defendant acted with oppression, fraud, or actual malice in violating Section 34-01-20, and Plaintiff intends to seek leave to add a claim for exemplary and/or punitive damages against Defendant.

## DEMAND FOR JURY TRIAL

Plaintiff Joye Knutson hereby requests trial by jury Rule 38(b) of the Federal Rules of Civil Procedure.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Joye Knutson requests that the Court issue judgment against Defendant, as follows:

A. For an Order declaring the practices and conduct of Defendant complained of herein to be in violation of the rights guaranteed to Plaintiff under the FLSA and North Dakota law;

B. For an Order declaring the practices of Defendant to be in willful violation of Plaintiff's rights under the FLSA;

C. For an award to Plaintiff against Defendant for liquidated damages under the FLSA;

D. For an award to Plaintiff against Defendant for all relief recoverable under the FLSA and North Dakota law, including, but not limited to, the loss of past and future income and benefits, emotional distress, humiliation, mental anguish, loss of reputation, lost earning capacity, and other harm, as required or permitted by law, all in an amount in excess of $75,000 to be determined at trial;

E. For an award of punitive damages to Plaintiff and against Defendant as required or permitted by the FLSA, and in an amount to be determined at trial;

F. For leave to amend the Complaint to claim exemplary and/or punitive damages as permitted under state law;

G. For an award of civil penalties to Plaintiff and against Defendant as required or permitted by law, and in an amount to be determined at trial;

H. For an award to Plaintiff and against Defendant for her attorneys' fees, costs, and disbursements incurred this action, as required or permitted by law;

I. For an award of prejudgment interest and other interest on a judgment as required or permitted by law;

J. For such other and further relief as available by statute; and

K. For such other and further relief as the Court may deem just and equitable.

Dated: November 2, 2022		NICHOLS KASTER, PLLP

s/Steven Andrew Smith
Steven Andrew Smith, MN Bar No. #260836
smith@nka.com
Michelle L. Kornblit, MN Bar No. #0397778
mkornblit@nka.com
4700 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Tel: (612) 256-3200
Fax: (612) 338-4878

ATTORNEYS FOR PLAINTIFF